ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| FRANCISCO A. PADILLA RIVERA Y SUCESIÓN MARGARITA I. KUINLAM VIÑAS<br><br>Apelantes<br><br>v.<br><br>SOL MELIÁ VACATION CLUB PUERTO RICO, CORP. Y OTROS<br><br>Apelados | KLAN202301155 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Carolina<br><br>Civil núm.: CA2019CV04609<br><br>Sobre: Sentencia declaratoria |

Panel integrado por su presidenta la jueza Ortiz Flores, el juez Rivera Torres, la jueza Rivera Pérez y el juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de diciembre de 2024.

Comparece la parte demandante y apelante conformada por el Sr. Francisco Padilla Rivera y la Sucesión de la Sra. Margarita Kuinlam Viñas (q.e.p.d.).[1] Solicita la revocación de la *Sentencia* dictada en forma sumaria el 28 de septiembre de 2023, notificada al día siguiente, por el Tribunal de Primera Instancia, Sala de Carolina (TPI). En el referido pronunciamiento judicial, el TPI declaró con lugar sendos petitorios sumarios, instados por la parte demandada y apelada, compuesta por Sol Meliá V.C. Puerto Rico Corp. (Sol Meliá) y Coco Condominium 1, LLC (Coco). En consecuencia, desestimó la reclamación de los comparecientes.

Anticipamos que, por los fundamentos que expondremos, confirmamos en parte y revocamos en parte la *Sentencia* impugnada.

---

[1] La Sra. Margarita Kuinlam Viñas (q.e.p.d.) fue sustituida por su Sucesión, mediante una moción a esos efectos, presentada el 24 de septiembre de 2020. La Sucesión está compuesta por los hijos de la Causante, Francisco Padilla Kuinlam, Ivette Padilla Kuinlam y Jorge Padilla Kuinlam; y su viudo, Francisco Padilla Rivera. Entrada 29 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).

Número Identificador

SEN2024_____

**I.**

La presente causa se inició el 2 de diciembre de 2019, ocasión en que la parte demandante incoó una *Demanda* contra Sol Meliá y otros demandados denominados con nombres desconocidos.[2] Luego, la parte demandante enmendó su reclamación civil para incluir a Coco.[3] En esencia, los demandantes alegaron que otorgaron un contrato privado con Sol Meliá, en calidad de "Prestadora", el 9 de marzo de 2011: "Contrato de Prestación del Servicio de Alojamiento Vacacional Fase I" (Contrato).[4] Mediante éste, se pactó la compraventa de una membresía para el uso de las instalaciones en un inmueble de multipropiedad. Por virtud del acuerdo, la parte demandante pagó a los demandados una suma de $83,881.58 como precio de adquisición.[5]

Los demandantes expusieron que las instalaciones no han estado disponibles desde el 20 de septiembre de 2017, entre otras causas, por el huracán María.[6] Por consiguiente, solicitaron infructuosamente la devolución de lo pagado de conformidad con lo presuntamente acordado.[7] **Como primera causa de acción, intimaron al TPI para que aquilatara el acuerdo contractual, con el fin de determinar si procedía o no la devolución de todo el monto dinerario**.

De otro lado, la parte demandante cuestionó si Sol Meliá estaba o no autorizado a transferir el proyecto de tiempo compartido,

---

[2] Apéndice del recurso, págs. 76-94. Véase la alegación responsiva de Sol Meliá a las págs. 95-102.
[3] Apéndice del recurso, págs. 105-111.
[4] Apéndice del recurso, págs. 83-88 (ilegible); véase, págs. 306-311.
[5] El precio de compra fue satisfecho de la siguiente manera: un pago inicial de $17,082.01; financiamiento de $66,799.57 a 12.40% de interés anual; a 120 plazos y con pagos mensuales de $973.89. El primer pago fue efectuado 8 de abril de 2011 y el saldo final, el 14 de noviembre de 2015, por la cuantía de $45,934.20.
[6] Apéndice del recurso, pág. 89.
[7] La solicitud de reembolso se extendió al Departamento de Asuntos del Consumidor (DACo). No obstante, el DACo no adquirió jurisdicción para mediar en la controversia, toda vez que, en la Décimo Cuarta cláusula del Contrato, los contratantes acordaron que, de no lograrse un arreglo, éstos dirimirían sus contenciones ante el Tribunal General de Justicia. Véase, Apéndice del recurso, págs. 87; 90-94.

el inmueble y sus obligaciones a Coco, sin contar con la anuencia de los demandantes. Adujo que contrató con Sol Meliá por la calidad de su servicio y representación mundial; y que advino en conocimiento de la transacción de compraventa de las instalaciones del Club Vacacional a Coco por medio de la prensa. Denunció desconocer los términos de la contratación entre los demandados; y sostuvo que la falta de participación en la negociación le privó de evaluar los cambios a los beneficios y derechos que tenía bajo la contratación anterior. Ello, para conocer si los acuerdos allegados satisfacían o no las expectativas que tuvo al consentir la contratación original. Así como para saber, por ejemplo, si Coco podía o no brindar el servicio de excelencia, calidad y ambiente familiar que, en su día, brindó Sol Meliá. Planteó que entre los beneficios determinantes para adquirir las unidades de tiempo compartido fue que éstas pertenecían a Sol Meliá Vacation Club, lo que le daba acceso al *Sol Meliá Vacation Network* (SMVN), mediante el "Contrato de Servicios de la Red". Este beneficio brindaba acceso a clubes vacacionales de Meliá a través del mundo. Aseguró que, luego de la adquisición de Coco, ya no tenía estos beneficios. A tales efectos, aseveró que, como "Prestadora", Coco estaba compelido a asumir íntegramente las obligaciones pactadas por Sol Meliá, en lugar de sustituir las condiciones por unas inferiores. Por lo dicho, como segunda causa de acción, peticionó una suma de $100,000.00 para resarcir los alegados daños ocasionados.

Sol Meliá presentó su *Contestación a la Demanda Enmendada.*[8] Adelantó que no tenía sede en Puerto Rico, ya que había cerrado operaciones en esta jurisdicción. Reconoció el pacto contractual con la parte demandante en 2011. Indicó que se trataba de la adquisición de un derecho de uso sobre un tipo de alojamiento.

---

[8] Apéndice del recurso, págs. 112-120.

Por igual, aceptó que el huracán María causó severos daños estructurales al inmueble, lo que forzó al cierre temporero de las instalaciones. Sin embargo, acotó que, una vez culminadas las reparaciones, las operaciones se reanudaron *bajo una nueva bandera hotelera.*

En cuanto a los reclamos de reembolso de la parte demandante, Sol Meliá aceptó conocerlo. Empero, negó que los demandantes tuvieran derecho a obtener el remedio invocado; y añadió que, en su momento, ofreció otras alternativas en consideración al cierre de las operaciones debido a los daños causados por el siniestro atmosférico.

Con relación a la segunda causa de acción de daños, Sol Meliá indicó que el 29 de marzo de 2019 vendió y cedió a Coco la propiedad desde donde operaba el Club Vacacional. Como parte de los activos transferidos a Coco, mencionó los contratos de compraventa de alojamiento, como el de los demandantes, por lo que los socios pasaron a ser miembros del Club Vacacional operado por el nuevo comprador. Así, pues, aseguró que el derecho de uso sobre el alojamiento en la propiedad, sita en Río Grande, permaneció sin alterar, pero ahora bajo Coco. Afirmó, además, que la referida compraventa era legal y contractualmente permisible, aun cuando el contrato no tuviese un lenguaje específico a esos efectos. Aclaró que todos los socios fueron notificados por escrito en abril de 2019, una vez se concretó la transacción, no antes.

Por su parte, Coco instó *Contestación a "Demanda Enmendada".*[9] En resumen, expresó que conforme con el Contrato, los socios o usuarios adquirían un derecho de uso sobre un tipo de alojamiento cuyos límites, términos y condiciones hablaban por sí solos en el acuerdo. Corroboró que, desde 2019, advino dueño del

---

[9] Apéndice del recurso, págs. 121-126.

Club Vacacional, antes conocido como Sol Meliá Vacation Club, y que desde esa fecha las instalaciones se encontraban disponibles para su uso al tenor de los términos y condiciones ya pactados. Reiteró que, luego del paso del huracán María, Sol Meliá ofreció alternativas a los usuarios para el pago de las cuotas de mantenimiento. Por igual, Coco sostuvo que Sol Meliá contaba con la facultad de vender, ceder o transferir los derechos de alojamiento y demás obligaciones. Alegó también que el derecho de uso adquirido por la parte demandante bajo el Contrato original ha permanecido sin alterar. Por consiguiente, rechazó que los demandantes tuvieran derecho al remedio de reembolso solicitado.

A su vez, Coco adujo que la afiliación y uso de la red de intercambio SMVN estaba sujeta a un acuerdo distinto y separado del Contrato, en alusión al Contrato de Servicios de la Red.[10] Éste último, comprendía límites, términos y condiciones que hablaban por sí solos; y el cual requería el pago de una cuota anual separada. Expresó: "La pertenencia a la red de intercambio de Meliá se renovaba de año en año, siempre que, entre otras, el usuario estuviese al día con el pago de sus cuotas de afiliación a la red y mientras no se te[rm]inase, asignase, vendiese o de otra forma transfiriese el Contrato de Compraventa en cuyo caso, la participación en la red terminaría automáticamente".[11] En suma, el demandado sostuvo que no había incumplido los términos y condiciones de los acuerdos cedidos ni causado daño alguno a la parte demandante, y acotó que la reclamación civil no justificaba la concesión de un remedio.

Entonces, las partes sometieron conjuntamente el *Informe para el Manejo del Caso* el 22 de abril de 2021[12] e iniciaron el

---

[10] Apéndice del recurso, págs. 312-314.
[11] Apéndice del recurso, pág. 124 acápite 3.8.
[12] Apéndice del recurso, págs. 131-140.

descubrimiento de prueba.[13] El TPI celebró varias audiencias con motivo de la conferencia inicial, auscultar una transacción y sobre el estado de los procedimientos. La Conferencia con Antelación al Juicio quedó pautada para el 30 de agosto de 2022.[14] Cabe señalar que el TPI atendió ciertas contenciones con relación al proceso de descubrimiento, en particular, las relacionadas con el "Timeshare Purchase and Sale Agreement" (Purchase and Sale Agreement) entre Sol Meliá y Coco.

Así las cosas, el 22 de agosto de 2022, Sol Meliá incoó un *Escrito en Solicitud de Sentencia Sumaria*.[15] **Como cuestiones a dirimir, planteó si había o no incumplido algún término contractual**, al palio del Artículo 1054 del Código Civil de 1930, *infra*, cuando vendió la propiedad y los contratos de membresía; así como si estaba o no autorizado a cancelar las membresías del SMVN una vez finiquitada la transacción. Sol Meliá anticipó la respuesta negativa a la existencia de alguna controversia que ameritara la celebración de un juicio en su fondo. Acompañó su solicitud por la vía de apremio con documentos notariales, contratos privados, fragmentos de deposiciones, entre otros. Esbozó 41 determinaciones fácticas incontrovertibles, debidamente adoptadas en el dictamen apelado[16] y de las cuales citamos las siguientes:

> 1. Sol Meliá V.C. Puerto Rico, Corp., [Sol Meliá] no tiene cede en Puerto Rico por haber cerrado operaciones en la jurisdicción. (…)
>
> .     .     .     .     .     .     .     .
>
> **LA PROPIEDAD BASE**
> 3. Mientras estuvo en operación, [Sol Meliá] era la dueña de una propiedad sita en la Península de Coco Beach, Río Grande, PR., que albergaba los espacios de alojamiento vacacional que fueron objeto de

---

[13] Apéndice del recurso, págs. 127-130; 142-235; 244-246; 252-254; 258-283.
[14] Véase, Apéndice del recurso, págs. 141; 236-239; 240-241; 242-243; además, las entradas 48 y 70 y 82 del SUMAC.
[15] Apéndice del recurso, págs. 421-562.
[16] En el dictamen, el TPI invocó la Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, y el caso *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019). Apéndice del recurso, pág. 12.

compraventa y que están en controversia en este caso.[17]
(...)

   .     .     .     .     .     .     .     .

5. [Sol Meliá] destinó dicha propiedad a ser usada como club vacacional, régimen mediante el cual toda persona que suscribiera un contrato de alojamiento vacacional, adquiría un derecho recurrente de uso sobre un tipo de espacio según descrito en el contrato y en los documentos anejados, sin que adquiriera un derecho o interés propietario sobre el terreno, las facilidades, la estructura, los apartamentos o villas, sus servidumbres, amenidades, áreas comunes, concesiones, equipos u otros similares anejados a la propiedad.

**EL CONTRATO DE ALOJAMIENTO VACACIONAL**
6. Para adquirir sus membresías, los compradores suscribían un acuerdo titulado Vacation Purchase Agreement o Contrato de Prestación del Servicio de Alojamiento Vacacional [Contrato].

7. El Contrato es el acuerdo por medio del cual [Sol Meliá] vendió, y cada miembro del club adquirió, sus derechos en el club vacacional.

8. Mediante [el Contrato] [Sol Meliá] vendió derechos de uso respecto a las unidades en el lugar base para prestar al público del servicio de al[o]jamiento vacacional.

9. En o alrededor del 2007, Francisco Padilla (Francisco) y Margarita Kuinlam (Margarita) otorgaron el [Contrato] número PR-C-00799 con [Sol Meliá].

10. Posteriormente, el 9 de marzo de 2011, Francisco y Margarita hicieron un incremento ("upgrade") para un espacio de alojamiento más grande y suscribieron el [Contrato] número GP-P-02928 con [Sol Meliá].[18]

11. Al otorgar el [Contrato], Francisco y Margarita suscribieron un nuevo pagaré por el precio de compra de ochenta y tres mil, ochocientos ochenta y un dólares con cincuenta y ocho centavos ($83,881.58).[19]

12. Según el [Contrato], Francisco y Margarita adquirieron un derecho de uso o servicio de alojamiento vacacional sobre una unidad tipo "suite" de tres recámaras tipo "lockoff" en la temporada Platino Plus, con 126,000 SMOpciones.

13. El [Contrato] en la Cláusula Segunda, las partes pactaron lo siguiente en cuanto al derecho de uso:

**SEGUNDA. DERECHO DE USO.** Mediante este Contrato, LA PRESTADORA [en referencia a Sol Meliá] se obliga a prestar los servicios aquí descritos, y el

---

[17] Escritura Pública 15 de 15 de octubre de 2018 (fragmento); Apéndice del recurso, págs. 444-485.
[18] Apéndice del recurso, págs. 502-504.
[19] Apéndice del recurso, págs. 486-501.

USUARIO [en referencia a la parte demandante] se obliga a pagar a tiempo el precio de compra, así como cualesquiera otros montos pagaderos bajo este CONTRATO, incluyendo aquellas cantidades desglosadas en el pagaré, si fuera aplicable, así como las cuotas de mantenimiento. Los derechos de uso y ocupación del USUARIO estarán sujetos a los términos y condiciones del REGLAMENTO. (…)

14. El [Contrato] establece lo siguiente en cuanto a la vigencia del contrato:

**TERCERA. VIGENCIA DEL CONTRATO.** A menos que el presente CONTRATO se diera por terminado como aquí se indica, este CONTRATO vencerá en la fecha más temprana de (a) la terminación del plazo de CINCUENTA (50) AÑOS DE USO desde la fecha en que el Usuario tenga derecho al primer PERIODO DE USO de la UNIDAD, o (b) a la terminación de CINCUENTA (50) PERIODOS de USO, o a la terminación de VEINTICINCO (25) PERIODOS de USO si el Usuario adquirió derechos en años alternos; y por consiguiente el USUARIO reconoce expresamente que no tendrá derecho alguno sobre el uso y goce de las Unidades, o áreas del Lugar Base, luego del vencimiento anteriormente mencionado. (…)

15. Además, del derecho al uso en unidades en el lugar base, el [Contrato] establece lo siguiente sobre el sistema de intercambio:

**SÉPTIMA. SISTEMA DE INTERCAMBIO.** EL LUGAR BASE podrá afiliarse a un sistema de intercambio mediante el cual el USUARIO podrá intercambiar sus derechos a servicios de alojamiento vacacional con otros proyectos nacionales e internacionales pagando la cuota de intercambio correspondiente ("Sistema de Intercambio"). LA PRESTADORA pagará el costo inicial de inscripción impuesta por dicho Sistema de Intercambio, y el USUARIO será responsable por el pago de cualquier cuota de renovación y/o otras cuotas. (…)

         .      .      .      .      .      .      .      .

**CONTRATO DE SERVICIO DE LA RED**
17. El 9 de marzo de 2011, Francisco y Margarita suscribieron un "Contrato de Servicios de la Red" ("NSA") con [Sol Meliá].[20]

18. Este contrato o NSA establece que el "Sol Meliá Vacation Network" (o "SMVN"), una corporación de Luxemburgo es la propietaria y operadora de un sistema de reservaciones e intercambio a nivel internacional de una red de intercambio vacacional internacional que provee intercambios vacacionales internacionales y servicios de reservaciones desde sus oficinas en Luxemburgo.

---

[20] Apéndice del recurso, págs. 505-507.

19. Mediante el [Contrato de Servicios de la Red], Francisco y Margarita se inscribieron en el SMVN y reconocieron que:

...la Red es una empresa de servicios operada por SMVN desde y a través de sus oficinas en la Ciudad de Luxemburgo, Luxemburgo y que SMVN no tiene oficinas, instalaciones o personal localizado en los Estados Unidos. (...)

20. Según el [Contrato de Servicios de la Red], entre los servicios que provee la inscripción al SMVN se incluyen: (i) Servicio de reservaciones para permitir a los Socios de la Red reservar unidades en el Resort, tal como ese término está definido en el [Contrato] o en otros alojamientos en resorts afiliados a la Red ("Resorts de la Red") para el uso y disfrute de los Socios de la Red; (ii) acceso a programas de intercambio que permiten a los Socios de la red el uso de alojamientos que no están afiliados o asociados con la Red (Programas de Intercambio Externo); y (iii) cualquier otro beneficio vacacional, de viajes, ocio, entretenimiento u otro beneficio que SMVN pueda ofrecer a los Socios de la Red de tiempo en tiempo.

21. A tenor con los términos del [Contrato de Servicios de la Red], Francisco y Margarita se obligaron a un pago separado de cuotas de membresía, que debía ser completado anualmente y, constituía una condición para el disfrute continuo de la red de intercambio SMVN.

22. Asimismo, en cuanto al término del contrato, el [Contrato de Servicios de la Red] provee lo siguiente: [Sol Meliá] inscribirá al Socio en la Red y los beneficios de membresía de la Red estarán disponibles para uso por parte del Socio comenzando en el primer Año de Uso del Socio. La participación del Socio en la Red será automáticamente renovada cada año o cada año alterno si el Socio ha elegido participar en el Programa de Año Alterno, sujeto a que el Socio esté al corriente en el pago de todos los costos, mientras que el Socio tenga un interés en el Resort de Propiedad de acuerdo con el [Contrato]; **sin embargo, en el momento de que ocurra primero la terminación, cesión, venta o cualquier otra forma de transferencia del [Contrato], o de los derechos bajo el mismo, la participación del Socio en la Red automáticamente terminará.**

23. Sobre la cesión de derechos bajo el [Contrato de Servicios de la Red], éste indica:

El socio no podrá ceder sus derechos bajo este contrato. **El Socio reconoce que la Prestadora de Servicios está autorizada para ceder sus derechos e intereses bajo este contrato sin notificación previa al Socio y sin consentimiento del Socio,** para asegurar de esta manera que siempre haya una compañía prestadora del servicio.

24. A su vez, al momento de suscribir los documentos relacionados a la compraventa del alojamiento vacacional, y luego de firmar el [Contrato de Servicios de la Red] o contrato de membresía a la red de intercambio SMVN, Francisco y Margarita también suscribieron un documento titulado "Mutuo Entendimiento de los Compromisos Adquiridos" ("A&U" por sus siglas en inglés [de "Acknowledgement and Understanding").[21] Mediante la firma de este documento, Francisco y Margarita hicieron un reconocimiento expreso que ninguna expresión o representación oral o escrita fuera de o, distinta a aquellas que están expresamente contenidas en el [Contrato] y el [Contrato de Servicios de la Red] son válidas ni obligan. (…)

25. Francisco y Margarita también acusaron recibo[22] del "Reglamento"[23] que recoge las normas de uso de las facilidades del club vacacional en Río Grande y del "Sol Meliá Exchange Network Rules"[24] el cual es un documento separado y distinto que recoge las normas de uso y normas operaciones de la red de intercambio SMVN.

.      .      .      .      .      .      .      .

28. El 29 de marzo de 2019, [Coco] adquirió de Sol Meliá la propiedad de alojamiento vacacional ("timeshare") en los predios del complejo turístico conocido anteriormente como "Club Vacacional Sol Meliá en Paradisus Puerto Rico", sector Coco Beach, en Río Grande, P.R.

29. A la fecha de la venta, [Sol Meliá] culminó la afiliación de todos sus miembros al SMVN.

30. Así como fue hecho con todos los demás miembros activos a la fecha de la venta, Francisco recibió una carta fechada 25 de abril de 2019 de parte de Coco y [Sol Meliá] en la cual le fue informado sobre la venta del Club Vacacional, y otros detalles relevantes a su derecho de uso.[25]

.      .      .      .      .      .      .

**CIERRE DE FACILIDADES POR CONSECUENCIA DEL PASO DEL HURACÁN MARÍA**

.      .      .      .      .      .      .

37. Como consecuencia de la devastación causada por el paso del Huracán María, hubo un cierre temporero del lugar base y, a través de un "Anexo al Contrato de Compraventa de Alojamiento Vacacional Como Resultado del Paso del Huracán María por Puerto Rico,"[26] [Sol Meliá] ofreció una serie de alternativas para flexibilizar, entre otras cosas, el pago de las cuotas de

---

[21] Apéndice del recurso, págs. 508-509.
[22] Apéndice del recurso, págs. 510-511.
[23] Apéndice del recurso, págs. 512-520.
[24] Apéndice del recurso, págs. 521-529.
[25] Apéndice del recurso, pág. 342. Constatamos que la dirección de envío de la misiva es la misma a la brindada por la parte demandante en su *Demanda Enmendada.*
[26] Apéndice del recurso, págs. 358-359.

mantenimiento, los pagos mensuales bajo el [Contrato] y el uso de la membresía SMVN. (...) Los demandantes no se acogieron a cualquiera de las opciones ofrecidas por SMVC para mitigar el impacto del cierre de las operaciones en el lugar base.

38. En cuanto a la disponibilidad del "timeshare" luego del Huracán María, los demandantes admiten haber optado por no auscultar alternativas disponibles para hacer uso de su derecho, porque según testificó el Sr. Jorge Padilla Kuinlam; "todo estaba destrozado por el huracán, es lo que pasó. Es lo que pasó, todo estaba destrozado. Puerto Rico estaba hecho un desastre y dónde más pegó [el huracán] fue allí, en Río Grande".

39. La última vez que los demandantes hicieron uso de su derecho de alojamiento vacacional o "timeshare" en el lugar base fue antes del huracán María. (Énfasis en el original).

.        .        .        .        .        .        .        .        .

De conformidad con los enunciados, Sol Meliá coligió que estaba autorizado a vender su propiedad a Coco, sin la participación de la parte demandante. Es decir, en ningún momento, el miembro adquirió un *derecho real* sobre la propiedad que alberga el Club Vacacional, sino que obtuvo un *derecho de uso* del espacio. Asimismo, negó haber incurrido en algún incumplimiento contractual por la falta de uso tras el paso del huracán María. Postuló, además, que los demandantes no habían demostrado que las condiciones ofrecidas por Coco eran "inferiores", y resaltó las admisiones de la parte demandante, en torno a su desconocimiento de lo que comprendía la membresía con Coco Beach Vacation Club: "Jorge [Padilla Kuinlam] testificó y admite que desconoce los beneficios que ofrece Coco Condominio bajo el contrato de compraventa".[27]

Unos días antes de la petición de Sol Meliá, el 19 de agosto de 2022, Coco había presentado también una *Moción de Sentencia Sumaria*.[28] El demandado rechazó haber incumplido alguna disposición contractual y expuso 53 determinaciones de las cuales

---

[27] Apéndice del recurso, págs. 432; 549 líneas 12-21.
[28] Apéndice del recurso, págs. 284-420.

no existía controversia. Los enunciados fueron sustentados por la prueba documental que Coco anejó a la petición abreviada. Entre estos documentos se encuentran los acuerdos contractuales aludidos, fragmentos de deposiciones, contestaciones a los interrogatorios, así como la declaración jurada de la Sra. Omaira López (señora López), en su carácter gerencial de Coco Vacation Club. Entre otras aseveraciones, la señora López indicó que Coco estaba afiliado al "programa de intercambio de 'Resorts Condominium International' (RCI) bajo el cual los socios pueden disfrutar de los beneficios de afiliación con una colección diversa de propiedades alrededor del mundo, incluyendo acceso a resorts y propiedades de Sol Meliá".[29] Añadió que RCI operaba en conjunto con "Resorts Advantage", un servidor de reservas y agente financiero, bajo el cual los socios pueden intercambiar su derecho de uso de su lugar base con otras opciones de RCI.[30] Apuntó que la parte demandante no había solicitado alojamiento vacacional ni en el lugar base ni en las opciones provistas por RCI.[31]

Destacamos las siguientes determinaciones incontrovertibles que el TPI acogió en la *Sentencia* dictada sumariamente, aquí impugnada:[32]

.    .    .    .    .    .    .    .

31. El 24 de diciembre de 2018, Sol Meliá y Coco Cond[o]minium suscribieron un documento titulado "Timeshare Purchase and Sale Agreement" ("Purchase and Sale Agreement") para llevar a cabo cierta transacción de compraventa de la propiedad inmueble donde ubica el Lugar Base así como otros activos no relacionados a esta controversia.[33]

32. Según el "Purchase and Sale Agreement", a la fecha del cierre de la transacción, Sol Meliá culminó la afiliación de todos sus miembros al SMVN.

---

[29] Apéndice del recurso, págs. 350-351 acápite 17.
[30] Apéndice del recurso, pág. 351 acápite 18.
[31] Apéndice del recurso, pág. 351 acápite 19.
[32] Véase nota al calce 16 de esta *Sentencia*.
[33] Véase, Apéndice del recurso, págs. 343-348. El fragmento del Purchase and Sale Agreement incluido en el expediente suprime ciertas partes de naturaleza confidencial.

33. Conforme al "Purchase and Sale Agreement" Sol Meliá y Coco Condominium acordaron conjuntamente notificar, por escrito, a todos los miembros de los "timeshares" sobre: (a) la venta de activos; (b) la terminación de la afiliación con el SMVN; y (c) cualquier otra información pertinente relacionada.

34. El 29 de marzo de 2019 fue el cierre de la transacción de compraventa de la propiedad inmueble donde ubica el Lugar Base de Sol Meliá a Coco Condominium.

35. A la fecha del cierre de la transacción, Coco Condominium adquirió de Sol Meliá 2,232 VPAs [es decir, contratos] activos.

36. Entre los [contratos] activos que adquirió Coco Condominium de Sol Meliá se encuentra el [Contrato], con número GP-P-02928, suscrito por Don Francisco y Doña Margarita.

. . . . . . . . .

40. El derecho de uso en el Lugar Base, según consagrado en los VPAs [es decir, contratos] y conforme a sus términos y condiciones, continúa según lo allí pactado tras la venta de activos de Sol Meliá a Coco Condo[m]in[i]um.

41. El tipo de unidad sobre la cual los demandantes tienen un derecho de uso a través del [Contrato], no se vio afectada o modificada de ninguna forma tras la compraventa de Sol Meliá a Coco Condominium.

42. Con excepción al periodo de tiempo que los "timeshares" estuvieron cerrados debido al cierre general ("lockdown") y demás restricciones impuestas para evitar la propagación y contagio del COVID-19, los socios que suscribieron el [Contrato] y que han cumplido con sus términos y condiciones, han continuado disfrutando de su derecho de uso sobre el "timeshare" desde que Coco Condominium comenzó a operar.[34]

43. Desde que Coco Condominium comenzó a operar, los "timeshares" han estado consistentemente, en promedio, en un 80% de capacidad o más, y en numerosas ocasiones han estado a 100% de capacidad ("sold-out").

. . . . . . . . .

Al tenor de lo anterior, Coco razonó que concurrían los elementos para un dictamen sumario, que no incumplió ninguna disposición contractual, por lo que no respondía por ningún daño

---

[34] Luego de la adquisición por Coco en 2019, las instalaciones en controversia estuvieron cerradas unas 11 semanas entre marzo y junio de 2020, como medida cautelar para evitar el contagio pandémico del COVID-19. Véase, Apéndice del recurso, pág. 350 acápite 15 y nota al calce 1.

alegado ni se justificaba la resolución del acuerdo en disputa. Al contrario, aseveró que "las obligaciones acordadas y asumidas por los demandantes en el [Contrato] son completamente válidas subsisten, son exigibles y se han honrado desde que el [C]ontrato fue cedido a Coco Condominium. Es por ello que los demandantes no pueden liberarse de su obligación unilateralmente, basado en que supuestamente se le han ofrecido unos beneficios inferiores, cosa que no ha ocurrido aquí".[35]

El 27 de febrero de 2023, la parte demandante se opuso a ambos petitorios sumarios. Esto, **una vez tuvo a su disposición de manera fragmentada el Purchase and Sale Agreement, luego que el TPI estableciera su descubrimiento parcial, según la *Resolución* de 14 de diciembre de 2022**.[36]

En cuanto a la solicitud sumaria de Sol Meliá,[37] la parte demandante expuso las siguientes contenciones:[38] (a) que Sol Meliá aparece como una corporación activa en Puerto Rico (Sol Meliá 1); (b) que la Escritura Pública 15 otorgada en 2018 no era el documento del régimen vacacional, ya que, para efectos de los demandantes, desde 2007 operaba el Sol Meliá anterior; **añadieron que —sin el consentimiento ni conocimiento de los demandantes— de conformidad con la Sección 8.16 del Purchase and Sale Agreement, Sol Meliá consolidó de 135 a 45 unidades de "timeshare"** (Sol Meliá 3); (c) **que toda transacción o modificación del régimen de propiedad vacacional requería del consentimiento de los dueños y la aprobación de la Compañía de Turismo** (Sol Meliá 5); (d) que lo representado no reflejaba la totalidad de lo adquirido por los socios bajo el Contrato, ya que

---

[35] Apéndice del recurso, págs. 304-305.
[36] Apéndice del recurso, págs. 247-249.
[37] Apéndice del recurso, págs. 666-795. Admitieron como incontrovertibles los hechos 2, 4, 6, 9-14, 17, 25-27, 35-36 y 40-41.
[38] Las aseveraciones 16, 31, 32 y 33 de Sol Meliá objetadas por los demandantes fueron excluidas por esta curia por constituir conclusiones de derecho.

omitía que los demandantes adquirieron su derecho de membresía al SMVN, una obligación de la Prestadora, mediante el Contrato de Servicios de la Red y el Mutuo Entendimiento de los Compromisos Adquiridos "Membresías Elite" o A&U, suscritos en la misma fecha (Sol Meliá 7-8, 15, 18-22); (e) que los derechos cedidos entre Sol Meliá y Coco no correspondían a los de SMVN, que emanaban del Contrato de Servicios de la Red (Sol Meliá 23); (f) que la afirmación de que los demandantes reconocieron que ninguna expresión o representación oral o escrita fuera de o, distinta a aquellas que están expresamente contenidas en el Contrato y el Contrato de Servicios de la Red eran válidas ni obligaban era una invención (Sol Meliá 24); (g) que sin el conocimiento y consentimiento de los demandantes, Sol Meliá canceló su afiliación al SMVN al 24 de diciembre de 2018, no a la fecha de la venta en 2019 (Sol Meliá 28-29); (h) que la carta de 25 de abril de 2019 constituyó un acto coordinado de mala fe y las alternativas ofrecidas luego del huracán María fueron una demostración igual (Sol Meliá 30, 37); (i) que la parte demandante fue despojada de su derecho de uso (Sol Meliá 34); (j) que hubo otras razones que dilataron las reparaciones de los daños causados por el huracán María y el uso de la propiedad (Sol Meliá 38); y (k) que el enunciado citado en la deposición excluía otras partes del testimonio aludido, como que, luego del huracán María, trataron de viajar y les fue denegado (Sol Meliá 39).

La parte demandante enfatizó que el régimen de propiedad vacacional llevaba operando desde antes de la transacción y que, **sin el conocimiento ni consentimiento de los socios, se viabilizó la reducción de espacios vacacionales, lo que afectó el derecho de uso. Los demandantes sostuvieron que no fueron notificados por lo demandados para ejercer su derecho al voto ni tampoco éstos procuraron la aprobación de la Compañía de Turismo**. Por lo cual, los demandantes tildaron la compraventa entre Sol Meliá y

Coco como una engañosa, en violación de ley y con el pleno conocimiento e intención de privarlos de los derechos adquiridos con Sol Meliá a nivel local y la participación en su red de intercambio internacional. Razonó que los demandados eran solidariamente responsables por los daños de todo lo perdido por los demandantes bajo el Contrato.

Con relación a la petición sumaria de Coco,[39] en torno a las determinaciones que citamos antes, los demandantes presentaron las siguientes contenciones:[40] (a) que el Purchase and Sale Agreement no se limitó al inmueble y que los activos transmitidos sí son pertinentes a la controversia; añadió que Coco conocía de los derechos y obligaciones pactados con Sol Meliá (Coco 31); (b) que la desafiliación al SMVN fue parte de las negociaciones de los demandados sin el conocimiento ni consentimiento de los demandantes (Coco 32); (c) que todo lo relacionado al traspaso de activos no fue informado a los usuarios, quienes, además de perder la afiliación, a solicitud de Coco perdieron sustancialmente unidades para uso bajo el programa de "timeshare", por lo que la legalidad de la transacción está en controversia (Coco 34-36); (d) que **el derecho de uso fue mutilado, porque las unidades fueron reducidas sustancialmente de 135 a 45, sin el consentimiento de los usuarios**; y el cambio a Coco afectó el acceso al SMVN (Coco 40-42); (e) que la capacidad de uso de los "timeshares" en 80% o 100% no es un hecho material y sobre todo tomando en cuenta la reducción de unidades y la reducción en el número de socios en el programa de Coco. "No es lo mismo estadísticas basadas en la

---

[39] Apéndice del recurso, págs. 563-665.

[40] Los demandantes admitieron las siguientes aseveraciones de Coco: 2-11, 13, 17, 20-23, 26, 30, 37-39, 44-53. En cuanto al enunciado 33 de Coco, los demandantes se opusieron, pero no lo objetaron; y el 41 fue excluido toda vez que se trata de una conclusión de derecho. La parte demandante también objetó los enunciados 1, 12, 14-16, 18-19, 24-25, 27-29 los cuales son similares a los de Sol Meliá y ya fueron discutidos.

ocupación de 135 unidades bajo el programa que en 45 unidades bajo el mismo programa" (Coco 43).

Sol Meliá y Coco replicaron. Sol Meliá[41] insistió en no tener operaciones en Puerto Rico, pero que no había completado su gestión corporativa con el Departamento de Estado. Aclaró que la compraventa de sus activos a Coco se efectuó mediante el Purchase and Sale Agreement suscrito el 24 de diciembre de 2018; y la compraventa del inmueble que albergaba el Club Vacacional se realizó el 29 marzo de 2019. Reiteró que el derecho de los demandantes no era uno propietario sobre el inmueble.

Con relación a la reducción de unidades vacacionales como parte de los acuerdos con Coco, el demandado arguyó que se trataba de la inserción de nuevas alegaciones esbozadas de forma "confusa y enmarañada", a base de porciones del Purchase and Sale Agreement sacadas de contexto, que debían darse por no puestas al no haber enmendado la reclamación civil. Enfatizó que los demandantes no identificaron cambios en el tamaño de las unidades o su distribución, decoración, amenidades u otras modificaciones a los espacios que los socios ocupan durante sus estadías; sino que únicamente aluden a la bandera bajo la cual opera, sin evidenciar cómo ese cambio de bandera afectó, si en algo, la unidades o unidades disponibles. En fin, afirmó que su solicitud abreviada era procedente, que los demandantes no refutaron los hechos incontrovertibles y que al TPI sólo le restaba interpretar los contratos ante sí, aplicar el derecho y adjudicar las controversias.

Por su parte, Coco[42] esgrimió que los demandantes no cumplieron con las normas procesales, al no controvertir sus aseveraciones, por lo que los hechos propuestos debían darse por admitidos. Coincidió con Sol Meliá en que los demandantes

---

[41] Apéndice del recurso, págs. 796-817.
[42] Apéndice del recurso, págs. 818-842.

procuraban introducir nuevas alegaciones, sin prueba admisible que las sustentaran.

La parte demandante contestó con sendas dúplicas.[43] En esencia, planteó que su reclamación versaba sobre incumplimiento de contrato, la venta ilegal de sus derechos, falta de notificación adecuada y el desconocimiento de los pormenores de la venta. Resaltó que la parte demandada trató de eludir la entrega en el descubrimiento de prueba del Purchase and Sale Agreement ni lo utilizó en sus peticiones sumarias; y que no fue hasta la intervención del TPI que tuvo acceso al documento. En éste, indicó salieron a relucir situaciones específicas adicionales de incumplimiento de contrato y de un alegado esquema doloso en violación de sus derechos. A base de lo anterior, abogó que no requería realizar una enmienda adicional, sino que se trataba de evidencia que fortalecía sus alegaciones originales.

A la luz de lo anterior, en lugar de celebrar la *Conferencia con antelación al juicio* según pautada, el 29 de septiembre de 2023, el TPI notificó la *Sentencia* que nos ocupa.[44] Luego de adoptar e incorporar por referencia los fundamentos de los petitorios, declaró con lugar las peticiones sumarias y desestimó la *Demanda Enmendada.* La parte demandante solicitó la reconsideración y la formulación de determinaciones de hechos y conclusiones de derecho adicionales.[45] La parte demandada instó las respectivas oposiciones.[46] El TPI declaró sin lugar ambas solicitudes de los demandantes el 29 de noviembre de 2023, y notificó su determinación el 1 de diciembre de 2023.[47]

---

[43] Apéndice del recurso, págs. 843-892 (*Dúplica a Réplica de Coco…*); 893-963 (*Dúplica a la Réplica de Sol Meliá…*).
[44] Apéndice del recurso, págs. 1-13.
[45] Apéndice del recurso, págs. 14-56; 57-73.
[46] Véase, Apéndice del *Alegato de la parte apelada* [*Sol Meliá*], págs. 1-17; 18-24; y Apéndice del *Alegato de la parte apelada* [*Coco*], págs. 142-162; 163-185.
[47] Apéndice del recurso, págs. 74-75.

La parte demandante acudió ante este foro revisor el 28 de diciembre de 2023, mediante un recurso apelativo. Esbozó los siguientes señalamientos de error:

A. ERRÓ EL TPI AL DECLARAR CON LUGAR LAS MOCIONES DE SENTENCIAS SUMARIAS PRESENTADAS DE MANERA PREMATURA POR LAS CODEMANDADAS-APELADAS, INDICANDO EN CONTRA DEL EXPEDIENTE Y DE SUS PROPIAS ÓRDENES, QUE EL DESCUBRIMIENTO DE PRUEBA HABÍA CONCLUÍDO Y QUE SE HABÍA CELEBRADO LA CONFERENCIA CON ANTELACIÓN AL JUICIO.

B. ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA ANTE LA EXISTENCIA DE CONTROVERSIAS DE HECHOS ESENCIALES Y PERTINENTES QUE SURGÍAN DE LA PROPIA DOCUMENTACIÓN QUE TUVO ANTE SÍ.

C. ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA FUNDÁNDOSE EN UN DERECHO TOTALMENTE INAPLICABLE A LOS HECHOS DEL CASO: A SABER: EL DERECHO DE CESIÓN DE CRÉDITO EN UN CASO EN QUE NI SIQUIERA EXISTÍA CRÉDITO ALGUNO QUE PUDIERA SER OBJETO DE CESIÓN.

D. ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA QUE RESULTA *ULTRA VIRES* AL SANCIONAR UNA ACTUACIÓN DE LOS DEMANDADOS APELADOS EN CONTRA DE LA LEY 204/2016 DE LA COMPAÑÍA DE TURISMO.

E. ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA EN ESTE CASO, ABDICANDO A SU DEBER MINISTERIAL DE RESOLVER LOS CASOS DE LA FORMA M[Á]S RESPONSABLE Y CORRECTA POSIBLE, VIOLANDO CON SU ACTUACIÓN EL DEBIDO PROCESO DE LEY DE LOS APELANTES Y FORZANDO, CON SU ACTUACIÓN, QUE EL [TRIBUNAL DE APELACIONES] TENGA QUE HACER LA REVISIÓN *DE NOVO* QUE EN PRIMERA INSTANCIA [É]L SE NEGÓ A HACER.

El 9 de febrero de 2024, la parte demandante solicitó ante esta curia una vista oral. Empero, en atención al resultado de este dictamen, la declaramos sin lugar.

Asimismo, en cumplimiento de nuestra *Resolución* de 25 de enero de 2024, Sol Meliá y Coco presentaron sendos alegatos, el 31 de enero y 26 de febrero de 2024, respectivamente. Con el beneficio de sus comparecencias, resolvemos.

**II.**

**A.**

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, gobierna el mecanismo de la sentencia dictada sumariamente. Esta herramienta procesal sirve al propósito de aligerar la conclusión de los pleitos, sin la celebración de un juicio en sus méritos, **siempre y cuando no exista una legítima controversia de hechos medulares, de modo que lo restante sea aplicar el derecho**. Véase, *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 676 (2018); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015). Así se puede propender a la solución justa, rápida y económica de los litigios de naturaleza civil, pero únicamente cuando no exista una controversia genuina de hechos materiales. *Pérez Vargas v. Office Depot*, 203 DPR 687, 699 (2021). En este sentido, **un hecho material "es aquél que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable"**. (Énfasis nuestro). *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 110. Por ello, "[l]a controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario". *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

> Ante una moción de sentencia sumaria, los jueces deben determinar primero cuáles son los hechos presentes, es decir, en qué conducta incurrieron las partes involucradas y las circunstancias que rodearon esas actuaciones. Esos hechos, a su vez, deben ser interpretados por el juez para determinar si son esenciales y pertinentes, y si se encuentran controvertidos. De encontrarse presente algún hecho material en controversia no podrá utilizarse el mecanismo de la Regla 36 de Procedimiento Civil, *supra.* Por el contrario, de no existir tal controversia de hecho, el tribunal deberá dictar sentencia a favor del promovente de la solicitud de sentencia sumaria si el derecho le favorece a este último.
>
> En todo caso debidamente instado ante un foro judicial habrá siempre una controversia de derecho presente y es precisamente esa controversia la que vienen los tribunales llamados a resolver. *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 226-227 (2015).

Por igual, puede dictarse una sentencia sumaria parcial, en que se resuelvan unas controversias que sean separables de una o más controversias restantes. *Id.*, pág. 212. Y es que la sentencia sumaria sólo procede en casos claros. Por tanto, cuando no existe una certeza prístina sobre todos los hechos materiales que motivaron el pleito, no debe dictarse una sentencia sumaria sobre todas las contenciones. *Pérez Vargas v. Office Depot, supra,* pág. 699 y los casos allí citados. Por ser éste un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley". *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 611 (2000).

Siendo esto así, sólo procede que se dicte la sentencia sumaria "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el Derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia". *Meléndez González et al. v. M. Cuebas, supra,* págs. 109-110, que cita a *Const. José Carro v. Mun. de Dorado,* 186 DPR 113 (2012). De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al.,* 132 DPR 115, 133 (1992).

En cuanto a la revisión de un dictamen sumario o la denegación de la resolución abreviada, este tribunal revisor se encuentra en la misma posición que el foro de primera instancia al determinar si procede o no una sentencia sumaria. Sin embargo, al revisar la determinación del tribunal primario, estamos limitados de dos maneras: (1) sólo podemos considerar los documentos que se presentaron ante el foro de primera instancia; y (2) sólo podemos

determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, así como si el derecho se aplicó de forma correcta. Esto es, no estamos compelidos a adjudicar los hechos materiales esenciales en disputa. *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004). El deber de adjudicar hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro intermedio.

A esos efectos, el Tribunal Supremo de Puerto Rico estableció el estándar específico que debemos utilizar como tribunal revisor al momento de evaluar determinaciones del foro primario en las que se conceden o deniegan mociones de sentencia sumaria. En lo pertinente, dispuso que "[l]a revisión del Tribunal de Apelaciones es una de *novo* y debe examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". *Meléndez González et al. v. M. Cuebas*, *supra*, pág. 118. Además, reiteró que por estar en la misma posición que el foro primario, debemos revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma recopilados en la Regla 36 de Procedimiento Civil. *Id.* Por lo cual, luego que culminemos nuestra revisión del expediente, de encontrar que en realidad existen hechos materiales y esenciales en controversia, debemos tener en cuenta el cumplimiento de la Regla 36.4 de Procedimiento Civil y exponer concretamente cuáles hechos materiales están controvertidos y cuáles están incontrovertidos. Por el contrario, de resultar que los hechos materiales y esenciales realmente están incontrovertidos, entonces nos corresponde revisar *de novo* si el foro impugnado aplicó correctamente el derecho a los hechos incontrovertidos. *Id.*, pág. 119. Al dictar una sentencia sumaria, este tribunal deberá realizar un análisis dual que consiste en: (1) analizar los documentos que acompañan la solicitud de

sentencia sumaria y en la oposición, así como aquellos que obren en el expediente del tribunal; y (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido refutadas en forma alguna por los documentos. *Vera v. Dr. Bravo*, *supra*, pág. 333. Una vez realizado este análisis el tribunal no dictará sentencia sumaria si: (1) existen hechos materiales controvertidos; (2) hay alegaciones en la demanda que no han sido refutadas; (3) surge de los documentos que se acompañan con la moción una controversia real sobre algún hecho esencial; o (4) como cuestión de derecho no procede. *Id.*, págs. 333-334.

**B.**

La Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V, R.59, establece los parámetros de una sentencia declaratoria. Así reza, en parte:

> El Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas aunque se inste o pueda instarse otro remedio. No se estimará como motivo suficiente para atacar un procedimiento o una acción el que se solicite una resolución o sentencia declaratoria. La declaración podrá ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y el vigor de las sentencias o resoluciones definitivas.
>
> .    .    .    .    .    .    .    .

La sentencia declaratoria "es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra el promovente". *Sánchez et al. v. Srio. de Justicia et al.*, 157 DPR 360, 383-384 (2002), refrendado en *Alcalde de Guayama v. ELA*, 192 DPR 329, 333 (2015). El inciso (c) de la Regla 59.2 establece que el ejercicio de las facultades generales conferidas en la Regla 59.1 no se ven restringidas ni limitadas dentro de cualquier procedimiento en que se solicite un remedio declaratorio, "siempre que una sentencia o decreto haya de poner

fin a la controversia o despejar una incertidumbre". 32 LPRA Ap. V, R. 59.2 (c). Por tanto, "[t]oda persona interesada en (...) un contrato escrito u otros documentos constitutivos de contrato, o cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por (...) un contrato (...) podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos (...) contrato[s] (...) y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven. Un contrato podrá ser interpretado antes o después de haber sido infringido". Regla 59.2 (a) de Proc. Civil, 32 LPRA Ap. V, R. 59.2 (a).

No obstante, "[e]l Tribunal podrá negarse a dar o a registrar una sentencia o decreto declaratorio cuando tal sentencia o decreto, de ser hecho o registrado, no haya de poner fin a la incertidumbre o controversia que originó el procedimiento. Regla 59.3 de Proc. Civil, 32 LPRA Ap. V, R. 59.3. En suma, la sentencia declaratoria "[e]s aquella sentencia que se dicta cuando existe una controversia sustancial entre partes con intereses legales adversos, con el propósito de disipar la incertidumbre jurídica". *Municipio de Fajardo v. Secretario de Justicia et al.*, 187 DPR 245, 254 (2012), que cita a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 5ta ed., Ed. LexisNexis, 2010, Sec. 6001, pág. 560.

## C.

Es norma conocida que, bajo la teoría general de obligaciones y contratos,[48] las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, la moral, ni al orden público".

---

[48] En consideración a que la obligación objeto de controversia se perfeccionó bajo la vigencia del Código Civil de 1930, aplicaremos dicho cuerpo normativo y su jurisprudencia interpretativa al asunto planteado. Ello así, en armonía con el Artículo 1812 del Código Civil de 2020, *Actos y contratos celebrados bajo legislación anterior*, 31 LPRA sec. 11717, que dispone: "Los actos y contratos celebrados bajo el régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos sus efectos según la misma, con las limitaciones establecidas en este Código".

*Rodríguez García v. UCA*, 200 DPR 929, 943 (2018); Art. 1207 del Cód. Civ. 1930, 31 LPRA ant. sec. 3372. Un contrato existe cuando una o varias partes prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio. *Id.*, págs. 726-727; Art. 1206 del Cód. Civ. de 1930, 31 LPRA ant. sec. 3371. El pacto será validado si concurren tres elementos esenciales, a saber: consentimiento, objeto y causa. *Id.*, pág. 727 y la jurisprudencia allí citada; Art. 1213 del Cód. Civ. de 1930, 31 LPRA ant. sec. 3391.

Como se sabe, las obligaciones nacen de la ley, los contratos, los cuasicontratos y los actos y omisiones en que intervengan la culpa o negligencia. *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 726 (2018); Art. 1042 del Cód. Civ. de 1930, 31 LPRA ant. sec. 2992. "**Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos**". (Énfasis nuestro). Art. 1044 del Cód. Civ. de 1930, 31 LPRA ant. sec. 2994. Este principio de *pacta sunt servanda* impone a las partes contratantes la exigencia de cumplir con lo pactado pues supone la inalterabilidad de los acuerdos contenidos en el contrato. *Rodríguez García v. UCA*, *supra*, pág. 943.

Claro está, existen contratos que exigen la realización de un ejercicio de interpretación a los fines de determinar la naturaleza de la obligación en que incurrieron las partes. *Nissen Holland v. Genthaller*, 172 DPR 503, 513 (2007); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 725-726 (2001). A tales efectos, el Artículo 1233 del Código Civil de 1930 disponía que: "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquellas". 31 LPRA ant. sec. 3471. Al respecto, el Tribunal Supremo de Puerto Rico ha opinado que debe seguirse la letra clara de un contrato, cuando la misma refleja

inequívocamente la voluntad de las partes. Por lo tanto, dicho principio **impone a los tribunales que la interpretación conferida a un contrato no le reste efectividad a las cláusulas contractuales que fueron válidamente acordadas**. Sin embargo, cuando no sea posible determinar la voluntad de las partes con la mera lectura literal de las cláusulas contractuales, entonces, se deberá recurrir a evidencia extrínseca para juzgarla, utilizando principalmente los actos anteriores, coetáneos y posteriores de los contratantes, el uso o costumbre y demás circunstancias indicativas de la intención contractual, incluyendo la ocasión, circunstancias, personas y el acuerdo que se intentó llevar a cabo. *Nissen Holland v. Genthaller, supra,* págs. 518-519.

Con relación al daño contractual, el Artículo 1054 del derogado Código Civil de 1930, 31 LPRA ant. sec. 3018. establecía que quien, en el cumplimiento de sus obligaciones contractuales, incurre en dolo, negligencia o morosidad o de alguna manera contraviene las mismas, tiene la responsabilidad de indemnizar los daños y perjuicios causados. El Tribunal Supremo ha resuelto que todo incumplimiento contractual que ocasione daños da lugar a una causa de acción para su resarcimiento. *Constructora Bauzá, Inc. v. García López,* 129 DPR 579, 593 (1991). **Para que proceda una reclamación en daños contractuales, es necesario que el daño sufrido surja exclusivamente como consecuencia del incumplimiento de una obligación pactada anteriormente, daño que no hubiese ocurrido sin la existencia del contrato**. *Maderas Tratadas v. Sun Alliance et al.,* 185 DPR 880, 909-910 (2012). Es decir, "[...] tiene que haber existido un acuerdo de voluntades que genere una obligación, situación o un estado de derecho producto de un convenio, que haya creado unas expectativas a base de las cuales actuaron las partes". *Soc. de Gananciales v. Vélez & Asoc.,* 145 DPR 508, 522 (1998). Nuestro ordenamiento dispone que, si la

parte incumplidora actuó mediando buena fe, procederán los daños por aquellas situaciones que se pudieron prever al momento en que se otorgó el contrato y que sean resultado del incumplimiento. Sin embargo, si medió dolo en el incumplimiento, procederá la indemnización por todos los daños que conocidamente se deriven del incumplimiento del contrato. Art. 1060 del Cód. Civ. de 1930, 31 LPRA ant. sec. 3024. En este tipo de acción, **quien reclama daños por incumplimiento del contrato tiene el peso evidenciario**. No basta con que el actor demuestre el incumplimiento de la obligación por el deudor, sino que precisa demostrar la existencia real y positiva de los daños causados. Véanse, *Colón v. Promo Motor Imports, Inc.*, 144 DPR 659 (1997); *Neca Mortg. Corp. v. A & W Dev. S.E.*, 137 DPR 860, 876-877 (1994).

En cuanto al resarcimiento por las angustias mentales por incumplimiento contractual, nuestro Tribunal Supremo ha resuelto que **procede la indemnización de los sufrimientos y las angustias mentales probados, siempre que estos se hubieran podido prever al momento de constituirse la obligación y sean consecuencia necesaria de su incumplimiento**. *Muñiz-Olivari v. Stiefel Labs.*, 174 DPR 813, 820 (2008). Ahora bien, como en todo reclamo de indemnización por angustias mentales, **el promovente tiene el peso de la prueba para evidenciar que se trata de sufrimientos y angustias mentales profundas y no de una pena pasajera**. Así pues, se debe demostrar que el reclamante quedó realmente afectado en su bienestar, salud y felicidad. *Rivera v. S.L.G. Díaz,* 165 DPR 408, 432 (2005).

### D.

Asimismo, excepto que se pacte cosa distinta, es un principio general que "**[t]odos los derechos adquiridos en virtud de una obligación son transmisibles con sujeción a las leyes**...". (Énfasis nuestro). Art. 1065 del Cód. Civ. de 1930, 31 LPRA ant. sec. 3029;

*Consejo de Titulares v. C.R.U.V.*, 132 DPR 707, 718 (1993). Ahora, el principio general de transmisibilidad no es absoluto y se reconoce, por ejemplo, la incedibilidad de los derechos personalísimos, si se ha pactado o si la ley lo proscribe. *Consejo de Titulares v. C.R.U.V.*, *supra*, págs. 719-720.

El Tribunal Supremo ha sostenido que la eficacia de **la cesión de derechos no depende del consentimiento del deudor y basta que la cesión le sea notificada para que se active la misma**. *IBEC v. Banco Comercial*, 117 DPR 371, 377 (1986). Esto, debido a que el cambio de acreedor no empeora la situación del deudor ni lo priva de las reclamaciones que tenía frente al cedente. *Consejo de Titulares v. C.R.U.V.*, *supra*, pág. 718.

Además, con relación a la validez de la cesión, nuestro alto foro ha pautado cuatro criterios para determinar si el acuerdo de cesión es o no válido; éstos son: que el crédito sea transmisible, que esté fundado en un título válido y eficaz, que sea un crédito existente y que éste tenga su origen en una obligación válida y eficaz. *Consejo de Titulares v. C.R.U.V.*, *supra*, pág. 723. Añadió la máxima curia:

> En cuanto al primer criterio, los créditos siempre serán transmisibles, tal y como ya mencionamos, excepto que esté presente alguna de las tres razones de incedibilidad: por haberse pactado, por prohibición legal o por la naturaleza personalísima del crédito.
>
> Con relación al segundo criterio, advertimos que el término "título" tiene fundamentalmente dos acepciones jurídicas. Según afirma Roca Sastre, en el sentido substantivo o material es la causa o razón jurídica de la adquisición, modificación o extinción de un derecho; en el sentido formal o instrumental, el título es la prueba gráfica o documental que constata o autentiza aquella causa o razón de adquisición.
>
> La existencia del crédito, conforme al tercer criterio, es imprescindible para su cesión. No puede cederse un crédito que ya se haya extinguido. (…).
>
> En cuanto al cuarto criterio, que la cesión del crédito tenga su origen en una obligación válida y eficaz, recordemos que toda obligación consiste en dar, hacer o no hacer alguna cosa. (…). . (Citas omitidas). *Id.*, págs. 723-724.

De igual manera, con relación a los elementos esenciales de la cesión, el Tribunal Supremo ha expresado que "son aquéllos que la ley exige para todo negocio jurídico: que la declaración (o declaraciones) de voluntad sea hecha por persona (o personas) con capacidad y que exista la concurrencia de consentimiento, objeto y causa". *Consejo de Titulares v. C.R.U.V., supra,* pág. 724.

**E.**

La Ley Núm. 204 de 28 de diciembre de 2016, *Ley de Propiedad Vacacional de Puerto Rico,* 31 LPRA sec. 1891 *et seq.* (Ley Núm. 204-2016) derogó su antecesora, Ley Núm. 252 de 26 de diciembre de 1995. En lo que atañe, la Ley Núm. 204-2016 atemperó las disposiciones que regulan la propiedad vacacional o de tiempo compartido y clubes vacacionales a la evolución presentada en dicha industria durante las décadas anteriores, siempre salvaguardando los derechos de los consumidores. La Sección 1-102, sobre el propósito legislativo y alcance dispone en parte:

> El propósito de esta Ley es reconocer que la venta y promoción de los planes de propiedad vacacional continúa siendo un segmento emergente y dinámico en la industria turística internacional; que este segmento sigue en crecimiento, tanto en volumen de ventas como en complejidad y variedad de la estructura del producto; y que un método de reglamentación uniforme y consistente es necesario para salvaguardar la industria del turismo puertorriqueño, para ofrecer un marco seguro para transacciones y para promover la confianza de todos los consumidores en Puerto Rico, incluyendo los puertorriqueños, los de los Estados Unidos y los del extranjero y para el bienestar económico de Puerto Rico. [...] 31 LPRA sec. 1891a.

Para la consecución de su fin, la Ley Núm. 204-2016 regula, por ejemplo, qué divulgaciones se requieren hacer a los compradores potenciales, las prácticas prohibidas, los derechos de los titulares, los poderes de la Compañía de Turismo, incluyendo el de investigar, entre otros asuntos. El estatuto no sólo impone la obligación de la buena fe, sino que su letra prevalece sobre cualquier otra ley o reglamento con relación a los derechos de propiedad vacacional.

Secs. 10-102 y 10-104, 31 LPRA sec. 1900a y 1900c. Dispone también que, ante cualquier incumplimiento, la persona afectada tendrá derecho a iniciar una reclamación en un tribunal con jurisdicción y competencia y solicitar el remedio adecuado, incluyendo los honorarios de abogado, si aplican. Sec. 10-105, 31 LPRA sec. 1900d. Es decir, la parte afectada ostenta legitimación estatutaria para incoar un pleito contra el infractor y remediar sus daños.

En lo atinente, el Inciso (46) de la Sección 1-104 define *titular* como "una persona que es propietaria o copropietaria de propiedad vacacional y **cualquier persona identificada como un 'socio' o cualquier calificativo similar**". (Énfasis nuestro). 31 LPRA sec. 1891c. A estos efectos, el estatuto establece que, "[u]na vez establecido el plan de propiedad vacacional, sólo podrá ser **modificado o terminado**, con la **expresa conformidad de la Compañía** la cual deberá asegurarse de que se ha cumplido con las disposiciones de esta Ley referentes a dicha modificación o terminación, y de que **los derechos de los titulares no son violados por dicha modificación o terminación**". (Énfasis nuestro). Sec. 12-101, 31 LPRA sec. 1902.

**III.**

En la causa presente, como cuestión de umbral, nos compete revisar *de novo* las peticiones de sentencia sumaria y sus respectivas oposiciones, réplicas y dúplicas. Al evaluar las formalidades que establece la Regla 36 de Procedimiento Civil, estimamos que la parte apelada cumplió con la exposición de hechos esenciales e incontrovertidos, correctamente enumerados. Además, anejó documentos en apoyo a las aseveraciones que propuso como incontrovertibles.

La parte apelante, por su lado, observó un cumplimiento satisfactorio de las normas procesales. En esencia, al exponer sus

oposiciones, basó sus contenciones fácticas en el *Timeshare Purchase and Sale Agreement*. Estos hechos no fueron refutados por los apelados en sus réplicas. Por lo tanto, opinamos que, en efecto, los apelantes lograron controvertir ciertos hechos relacionados con el imputado incumplimiento contractual que dio génesis a la reclamación civil que nos ocupa. Ante ello, el TPI no debió resolver por la vía sumaria la totalidad de las controversias ante su consideración. Veamos.

## A.

En los errores **A**, **B**, **D** y **E**, la parte apelante señala que la disposición del pleito de manera sumaria resultó prematura, ya que el descubrimiento de prueba no había culminado ni se había celebrado la *Conferencia con Antelación al Juicio*. Además, que no procedía la vía de apremio por la existencia de controversias de hechos esenciales que surgían de los documentos que obran en los autos. En lo que nos concierne, señaló el incumplimiento de la Undécima cláusula por la realización de cambios significativos sin la aprobación de los usuarios; así como contravenciones a la Ley Núm. 204-2016, en cuanto a falta de notificación a la Compañía de Turismo. Finalmente, aduce que el TPI abdicó a su deber ministerial en la adjudicación de las mociones, lo que infringió su debido proceso de ley. Por su relación intrínseca, discutiremos en conjunto los errores mencionados.

De entrada, en este caso, no surge del expediente la presentación de un *Informe de Conferencia con Antelación al Juicio*. Por lo tanto, la vista de dicha etapa procesal no pudo haberse celebrado, aun cuando alguna vista haya sido nombrada de esa manera. Según las instrucciones del TPI, "[e]l término para

presentar mociones dispositivas comenzará a transcurrir una vez se presente el informe de conferencia con antelación a juicio".[49]

De hecho, se desprende de la *Minuta* de 9 de mayo de 2023, una audiencia "híbrida", que la *Conferencia con Antelación al Juicio* se señaló para el 29 de septiembre de 2023 a las 11:00 a.m., mediante videoconferencia.[50] En esa oportunidad, el TPI dio instrucciones sobre la presentación del documento conjunto. Según las propias expresiones del TPI, con relación al descubrimiento de prueba, "la norma de esta Sala es que el mismo se cierra formalmente cuando se acepta el Informe de conferencia con antelación al juicio".[51] Eso nunca ocurrió. Nótese que los pedimentos sumarios fueron presentados más de un año antes. A tales efectos, no se equivocan los apelantes al pautar que las mociones fueron presentadas de manera prematura. Incluso, la fecha de la *Conferencia* coincidió con la notificación de la *Sentencia* apelada.

Del mismo modo, si bien el descubrimiento de prueba estaba sustancialmente completado; ciertamente la parte apelante no tuvo disponible las porciones más importantes del Timeshare Purchase and Sale Agreement, según evaluado en cámara por el TPI, hasta después de presentadas las peticiones sumarias. Conforme las expresiones de los apelantes, el documento legible se facilitó el 9 de enero de 2023.[52] Ciertamente, el beneficio del Purchase and Sale Agreement, aunque de manera parcial, sirvió para que los apelantes

---

[49] Apéndice del recurso, pág. 239(*Minuta* 7 de diciembre de 2021).

[50] Apéndice del recurso, págs. 255-257.

[51] Apéndice del recurso, pág. 257.

[52] Véase *Apelación*, pág. 8.
"Lo que hace lento el descubrimiento de prueba es que los abogados de la parte demandada han alegado que el documento de venta de este programa 'Time Sharing' es un documento confidencial, no contestan quién es la persona que negocia. [...] No puede solicitar un documento en específico porque no sabe si existe". Apéndice del recurso, pág. 236-237 (*Minuta* 7 de diciembre de 2021).
"El licenciado San [M]iguel informa al Tribunal que recibió el 'purchase agreement' donde bloquearon sustancialmente el documento con censuras ocultando partes y muestra el mismo al Tribunal". Apéndice del recurso, pág. 240 (*Minuta* 20 de abril de 2022).

alegaran otro tipo de incumplimiento contractual, según fue invocado en su reclamación original y la petición de sentencia declaratoria que dio inicio al pleito. Se trata de la reducción de 135 a 45 unidades, según acordado entre los apelados en la Sección 8.16 del Timeshare Purchase and Sale Agreement.

La Undécima cláusula del Contrato reza como sigue:

UNDÉCIMO. <u>CAMBIOS</u>. Para el caso de que LA PRESTADORA llevara a cabo cambios significativos que afecten material y adversamente las instalaciones y otras áreas comunes, respecto del LUGAR BASE, tales cambios estarán sujetos a la autorización por escrito de los usuarios, y tales cambios sólo serán validos si reciben la aprobación de la mayoría simple de los USUARIOS. Tales modificaciones deberán ser notificadas por escrito a la Compañía de Turismo, con al menos treinta (30) días de antelación a efectuarse las mismas.

Por otra parte, la Sección 8.16 del Timeshare Purchase and Sale Agreement dispuso:

Section 8.16 <u>Timeshare Regime Reorganization and Consolidation</u>. Prior to the Closing, Seller shall, at its sole cost and expense and in the manner described in Exhibit 8.16, cause all Timeshare Interests to be consolidated into forty-five (45) of the Units to enable the withdrawal of ninety (90) of the Units from the Timeshare Regime, including by completing all filings and documents necessary for such consolidation of the Timeshare Interests (the "<u>Timeshare Reorganization</u>").

En relación con la Ley Núm. 204-2016, los apelantes apostillaron la falta de notificación a la Compañía de Turismo, cuya obligación surge del Contrato. Recuérdese que la Ley Núm. 204-2016 otorga legitimación estatutaria a la parte afectada de cualquier infracción de ley.

En este caso, los apelados no replicaron las alegaciones y adujeron cuestiones procesales tangentes. Lo cierto es que el TPI estaba compelido a evaluar la totalidad del Contrato y disipar toda incertidumbre jurídica entre las partes litigantes. Adviértase que, en su defensa, Coco arguye que, desde que inició operaciones, los "timeshares" han estado ocupados en un 80% de capacidad o más, incluso 100% de capacidad. Sin embargo, dadas las unidades

disponibles, el 100% de capacidad actual era un 33% en antaño, previo a la consolidación.

Estimamos que estas cuestiones impedían un dictamen sumario final, cuya cuestión debe evaluarse en sus méritos en un juicio en su fondo. Como se sabe, antes de privar a una parte de su día en corte, el TPI debe tener ante sí la verdad de todos los hechos. Así, pues, el TPI debe dirimir si en el proceso de consolidación de las unidades, Sol Meliá debía o no cumplir con la Undécima cláusula. En la afirmativa, si el incumplimiento causó o no daños resarcibles a los apelantes, incluyendo el efecto en la proporción del monto de las cuotas de mantenimiento, si alguno.

**B.**

Ahora bien, no obstante lo anterior, el TPI no estaba impedido de resolver parcialmente aquellas controversias de Derecho claramente susceptibles de un dictamen sumario. En el error **C**, los apelantes arguyen que el TPI fundó su *Sentencia* en un Derecho inaplicable, en alusión a la cesión de crédito, toda vez que el pagaré había sido cancelado al saldarse la deuda. Sobre este particular, las oposiciones de los apelantes no lograron derrotar la resolución sumaria, ya que sus contenciones estaban sujetas a la interpretación judicial del Contrato, cuyas cláusulas hablan por sí mismas.

La causa presente versa sobre una solicitud de sentencia declaratoria de los derechos de las partes, conforme fueron pactadas en el Contrato. Los apelantes plantean que en el acuerdo no surge que Sol Meliá pudiera ceder, sin su consentimiento, el derecho de uso adquirido mediante el Contrato. No les asiste la razón.

De una revisión de la letra contractual se desprende que no existía impedimento alguno para que ambas partes cedieran sus derechos. Ello así, porque el derecho de cesión asistía tanto a Sol Meliá como a los apelantes. Claro está, en el caso de estos últimos,

la cesión se hallaba sujeta a ciertas condiciones, según pactadas en la Décimo Tercera cláusula. Por ejemplo, debía constar una notificación escrita previa, realizarse a través de Sol Meliá, ahora Coco, a quien se le reconoció que ostentaba un derecho preferente, entre otros términos.

En la causa presente, si bien los apelantes saldaron el pagaré, ciertamente mediante la Cuarta cláusula del Contrato se obligaron a satisfacer anualmente y por adelantado su parte proporcional de la cuota de mantenimiento. Este derecho de crédito, así como el Contrato en sí fue cedido de Sol Meliá a Coco, sin obligación de notificar a los apelantes con anticipación. Como se conoce, el Tribunal Supremo ha sostenido que **la eficacia de la cesión de derechos no depende del consentimiento del deudor y basta que la cesión le sea notificada para que se active la misma**. *IBEC v. Banco Comercial, supra,* pág. 377. Esto, debido a que el cambio de acreedor no empeora la situación del deudor ni lo priva de las reclamaciones que tenía frente al cedente. *Consejo de Titulares v. C.R.U.V., supra,* pág. 718.

En el caso de SMVN, en la Séptima cláusula del Contrato se establece que "[e]l LUGAR BASE **podrá** afiliarse a un sistema de intercambio mediante el cual el USUARIO **podrá** intercambiar sus derechos a servicios de alojamiento vacacional con otros proyectos nacionales e internacionales pagando la cuota de intercambio correspondiente ('Sistema de Intercambio')".[53] Además, las disposiciones contractuales del SMVN surgen de un acuerdo distinto, el Contrato de Servicios de la Red. Por virtud de este acuerdo, los apelantes aceptaron que estaban impedidos de ceder su derecho. Asimismo, del pacto surge palmariamente que "[e]l Socio reconoce que **la Prestadora de Servicios está autorizada para**

---

[53] Apéndice del recurso, pág. 308.

**ceder sus derechos e intereses bajo este contrato sin notificación previa al Socio y sin consentimiento del Socio**, para asegurar de esta manera que siempre haya una compañía prestadora del servicio".[54] (Énfasis nuestro). En la causa de autos, Coco cuenta con el RCI, mediante el cual los usuarios están afiliados a diversa de propiedades alrededor del mundo, incluyendo propiedades de Sol Meliá.

En este caso, la notificación por parte de sol Meliá y Coco tuvo lugar el 25 de abril de 2019:

> *Es con gran placer que le informamos que Sol Meliá Vacation Club en Gran Meliá Puerto Rico ha sido adquirida por Coco Condominium 1, LLC de Sol Meliá V.C. Puerto Rico Corporation. El Club de vacaciones será operado por Aimbridge Hospitality ahora será conocido como el Coco Beach Vacation [C]lub. Estamos increíblemente emocionados por la oportunidad de comenzar este nuevo capítulo con usted en Coco Beach Vacation Club.*
>
> *Para poder continuar proporcionándoles el mejor servicio, nos hemos asociado con Resorts Advantage, quien ha sido su operador de reservas y agente financiero durante los últimos 14 años. Los socios seguirán reservando en Coco Beach Vacation [C]lub a través de Resorts Advantage en 1-888-266-8803 o 305-670-8405, 9500 S. Dadeland Blvd. Ste. 300 Miami, FL 33156.*
>
> *Coco Beach Vacation Club también permanecerá afiliado con el programa de intercambio RCI weeks y los socios continuaran teniendo la capacidad de intercambiar su derecho de vacaciones en Coco Beach Vacation Club por el derecho a vacaciones en uno de los miles de resorts que también participan en el programa de intercambio de RCI weeks. Los socios también pueden ponerse en contacto con Resorts Advantage para explorar las oportunidades de intercambio.*
>
> *Aunque Coco Beach Vacation Club ya no estará afiliado a la red de vacaciones Sol Meliá, Meliá respetará todos los saldos actuales de los puntos Meliá Rewards (opciones ya convertidas) para permitir que todos los socios que también sean socios de la lealtad de Meliá Rewards Programa puedan utilizar sus puntos y ejercer todos los derechos y beneficios de acuerdo con el programa de fidelización de Meliá Rewards hasta que sus beneficios caduquen.*
>
> *El equipo Meliá le agradecer la oportunidad de haberle servido en el Coco Beach Vacation [C]lub estos últimos años. El equipo de Coco Condominium le agradece por permitirnos presentarnos y esperamos el futuro brillante en Coco Beach Vacation Club.*[55]

---

[54] Apéndice del recurso, pág. 313.
[55] Apéndice del recurso, pág. 342.

Por ende, perfeccionada la transacción y notificada en su día a los apelantes, somos del criterio que el TPI concluyó correctamente que Sol Meliá estaba autorizada a vender la propiedad del Club Vacacional de Río Grande y ceder los contratos de los usuarios a Coco. Esta determinación debe ser refrendada y podía adjudicarse de manera parcial, sin necesidad de disponer de la totalidad del litigio.

Por último, tomamos conocimiento que, en etapa postsentencia, la parte demandante instó una *Solicitud urgente de Relevo de Sentencia por fraude y engaño al Tribunal* el 9 de diciembre de 2023.[56] Sol Meliá presentó *Escrito en Oposición a "Solicitud urgente…"*,[57] al igual que Coco incoó una *Oposición a "Solicitud urgente…"*.[58] En torno a la contención, el 8 de enero de 2024, notificada el día 10, el TPI expresó mediante una *Resolución* que, al estar pendiente el presente trámite apelativo, una vez éste culminara resolvería la petición de relevo y sus oposiciones.[59] Consiguientemente, dicha cuestión puede unirse a las controversias pendientes de adjudicación según esbozadas antes.

**IV.**

Por los fundamentos expuestos, los cuales hacemos formar parte de este dictamen, acordamos confirmar la *Sentencia* apelada, en aquella parte que dispuso que Sol Meliá V.C. Puerto Rico Corp. estaba autorizada a vender a Coco Condominium 1, LLC la propiedad que alberga el Club Vacacional de Río Grande y a ceder los contratos de alojamiento vacacional.

Por la existencia de controversias medulares, revocamos y devolvemos la causa de acción ante el Tribunal de Primera

---

[56] Véase, Apéndice del *Alegato de la parte apelada* [*Sol Meliá*], págs. 54-61; y Apéndice del *Alegato de la parte apelada* [*Coco*], págs. 156-193.

[57] Apéndice del *Alegato de la parte apelada* [*Sol Meliá*], págs. 77-91.

[58] Apéndice del *Alegato de la parte apelada* [*Coco*], págs. 209-231.

[59] Refiérase a la entrada 181 del SUMAC.

Instancia, Sala de Carolina, para la continuación de los procedimientos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones